[Civ. No. 54766. Second Dist., Div. Five. Nov. 13, 1980.]

DONNA ARMAN PINEDA et al., Plaintiffs and Appellants, v. LOS ANGELES TURF CLUB, INC., Defendant and Respondent; McHAL ENTERPRISES, INC., Defendant and Appellant.

54

COUNSEL

Hill, Farrer & Burrill, William S. Scully, Jr., and Darlene B. Fischer for Plaintiffs and Appellants.

Larry D. Peterson, Horvitz, Greines & Poster, Horvitz & Greines, Irving H. Greines, Alan G. Martin, Ellis J. Horvitz and Martin Stein, for Defendant and Appellant.

Bonelli, Malone, Wood & Heib, Bonelli, Malone & Heib, John G. Bonelli and Stanley M. Sapiro for Defendant and Respondent.

OPINION

**KAUS, P. J.**—Appellants, the family of decedent Alvaro Pineda, appeal from a judgment in favor of the Los Angeles Turf Club, Inc. (Santa Anita), and McHal Enterprises, Inc. (McHal), rendered in plaintiffs' wrongful death action. McHal cross-appeals from the trial court's order granting plaintiffs' motion to tax costs.

Alvaro Pineda, a leading jockey, was killed in an accident which occurred in stall 8 of the starting gate at Santa Anita racetrack before the start of the fourth race on January 18, 1975. Pineda was mounted on a horse named Austin Mittler. While in the starting gate, the horse became fractious, lowered its head, and suddenly threw its head up and back, striking Pineda either on his head or chest as he was moving to his right attempting to get off the horse's back.

According to appellants' version of the facts the horse struck Pineda throwing him violently back against the stanchion of the starting gate which was unpadded—allegedly because of Santa Anita's negligent maintenance and operation and because it had been defectively designed and manufactured. Appellants contend that Pineda suffered a blow to the right side of his head as it came in contact with the stanchion and that this blow caused his death; they further claim that the blow was sustained while Pineda was wearing a helmet which should have protected him, but was defectively designed and manufactured by McHal.

Respondents' theory of the accident was that the fatal blow occurred when the horse's head came in contact with the left side of Pineda's head in an area below the helmet line and that neither the helmet nor any part of the starting gate had anything to do with the cause of death.

The accident happened in a matter of seconds. There were several eyewitnesses to the event and it was recorded on the racetrack's videotaping equipment. Five of six eyewitnesses supported respondents' theory that the horse's head struck Pineda's head. The sixth did not really know. (See fn. 2, infra.)

■ Appellants contend that the trial court erred in admitting the testimony of two defense experts because, in forming their opinions on issues crucial to the case, they relied on pretrial statements of witnesses to the accident.

The two experts were Doctor Alan Nahum and Arnold W. Siegel. Doctor Nahum is a professor of surgery at the University of California, San Diego who specializes in head and neck surgery. He was consulted by Santa Anita to ascertain the cause of Pineda's death and the means by which it occurred. He testified that the cause of Pineda's death was

"an injury to the central nervous system, particularly the brain," that the injury to the brain was caused by a blow to the head, "[s]ubstantially to the left side of the head," and that the mechanism that caused the blow "was an impact from the head of the horse."

Doctor Nahum was questioned concerning the materials on which he relied in forming his opinions. He testified that he came to his conclusion that death was caused by an injury to a vital part of the brain primarily from studying an autopsy report prepared by Doctor Bucklin, with whom he had also discussed the report. In his opinion the amount of force required to fracture the skull in the area of impact was about 1,600 to 1,800 pounds per square inch. In forming his opinion that the blow was to the left side of Pineda's head he relied on the autopsy report, the diagram attached to the autopsy report, a photograph of Pineda's head, taken at the time of the autopsy, a film of the incident[1] which included the actual movement in the starting gate which resulted in Pineda's death, and "the reports of the eyewitnesses." He stated that in viewing the film, what he "visualized was a contact and an impact between the head of the horse and the head of the decedent." However, the doctor also testified that if he had not seen the film he "would have been perfectly satisfied to have indicated it was a left-sided impact" relying on the autopsy materials alone.

On cross-examination it was made clear that Doctor Nahum's conclusions as to cause of death and point of impact—that is the part of Pineda's skull which sustained the blow—were derived from the doctor's medical training and expertise and were based largely on his analysis of the coroner's report, the attached diagram and the autopsy photograph. The doctor's conclusion that it was the horse's head and not any other instrumentality which struck decedent's head, was formed from watching the film and reading the witnesses' statements.

On redirect examination counsel for Santa Anita asked the witness to "assume...there has been certain testimony in this very courtroom from five independent eyewitnesses,...who testified that they saw the horse's head strike Mr. Pineda's head, would that alter or confuse or interfere or change or in any way disrupt the conclusions that you have come up with here today? The answer was "no."[2]

---

[1]The track video tape of the actual event was converted into a film and about 500 frames were converted to still pictures. These materials were shown to the jury.

[2]The statements used by the defense experts prior to the trial were not introduced in evidence or read to the jury. However, as already noted, five of six eyewitnesses, in fact

The other defense expert who allegedly relied on statements of witnesses in forming his opinion as to point of impact, was Arnold W. Siegel, a consultant in the field of biomechanics,[3] specializing in accident or injury reconstruction.

Siegel testified that he was contacted by Santa Anita within a month after the accident and was asked to "gather evidence...to analyze the event, to determine how the injuries did occur." He first viewed the videotape and then arranged to have the tape "converted into film so that I could utilize it in a stop-action approach, frame by frame analysis." About 500 frames of the film were also converted into still pictures which he studied. He was given statements and later deposition testimony that was "given by a number of the witnesses that were actually in the area around the gate and around the Stall No. 8." Siegel viewed photographs of the helmet and silks worn by Pineda at the time of the accident, but did not see the originals until the day of the trial. He reviewed the autopsy report and a photograph taken at the time of the autopsy and discussed them with Doctor Bucklin, the autopsy surgeon. He had photographs and measurements of the starting gate, photographs of a horse and rider in the starting gate, and photographs of Pineda's mount, Austin Mittler, wearing standard type blinkers.

The bulk of Siegel's testimony concerned his analysis of the film in order to determine the maximum velocity of the horse's head in its upward movement and thus to determine the force of the impact at the time the horse's head struck Pineda's head. Siegel testified that the horse's head weighed approximately 200 pounds and that from his in-

---

all who were in a position to observe the moment of impact, testified at the trial that the horse's head hit Pineda's head. There was, however, disagreement amongst the eyewitnesses as to several things, including whether or not Pineda's head was then thrust back against the right rear stanchion of the starting gate. One of the eyewitnesses, Charles Utterback, was dead at the time of trial and his deposition testimony was read to the jury. Although he at first testified that the horse's head hit Pineda in the chest, later, while being examined by plaintiffs' attorney, he testified as follows: "Q. From where you were standing could you actually see what part of his [Pineda's] body the horse made contact with? A. No, you couldn't, because he was facing away from me. Q. He would have been blocking your view of the horse? A. Yes....Q. And you assume it must have hit him around the chest area? A. Yes."

[3]Siegel testified that biomechanics is "the understanding or the application of engineering and physics principles to biological systems." He testified that within that field he was "interested in the human undergoing injury."

vestigation he determined that the force of the impact against Pineda's skull was over 7,000 pounds.[4]

Siegel's other important function at the trial was to show the film of the event to the jury. The film was run through several times and then played frame by frame with Siegel explaining and commenting.

Earlier, however, Siegel was asked the following question: "Sir, were you able to determine from the information supplied to you through any officer or through Santa Anita and further through your own investigatory processes how the plaintiff was injured?" He testified that in his opinion Pineda was injured when "[h]e was struck by the horse's head, his head against the horse's head or the horse's head against his, rather." He arrived at his conclusion in the following manner: "The first step, of course, was to review the witness statements to try and get some feeling. This is that closing down, if you will, process to try and understand from the witnesses what they saw or what they thought they saw, to look at the medical records to determine the area of impact, where were the contacts that occurred.

"And then with that information to go to the film and determine from the film on a frame by frame basis, not only if we could determine numerical information or velocities, this rate of change distance over time, but also to determine what is called kinematics, that is, the motion that takes place each frame.

"And based upon the film and kinematic and dynamic analysis of the film, the medical records, and also the witness statements, particularly two witness statements or two witnesses, Miss Fitzpatrick and Mr. Gonzales, I found that their description of the event very, very closely related to what occurred in the film."[5]

Siegel testified that he could not see the actual impact of the horse's head with Pineda's head in the film. The film did show, however, that

---

[4]Siegel testified that it would take a little less than 1,800 pounds of force to fracture human skull bones in the occipital area, the area of impact. This agreed with Doctor Nahum's testimony.

[5]Fitzpatrick and Gonzales were eyewitnesses who had already been called by the defense. Before Siegel testified counsel had advised him what eyewitnesses had testified. When later during cross-examination, appellants' counsel referred to "witnesses' statements," Siegel replied: "Well, I guess you would have to call it testimony now."

"the two objects, the heads, are on a collision course,..." In order to reach his conclusion that the horse's head hit Pineda's head he did refer to the witnesses' statements "[a]s well as my knowledge of the biomechanics and the force directions taken from Doctor Bucklin's report [the autopsy report] and Doctor Bucklin's discussion, or my discussion with him."

DISCUSSION

As indicated, the only contention on appeal is that the trial court erred in admitting the testimony of the two defense experts because in forming their opinions they relied on pretrial statements of witnesses. The remarkable aspect of this issue is that respondents, quite unnecessarily, made appellants a present of it. There was no need to have the experts state their conclusions in apparent partial reliance on pretrial statements that the horse's head struck Pineda: the trial record fairly burst with sworn testimony to that effect and hypothetical questions asking the experts to assume the head-to-head collision as part of the data on which they based their conclusions would have been eminently proper.[6]

Although we shall assume what respondents do not concede—that pretrial statements such as those considered by the two defense experts are not the type of material which may be relied on by experts in forming opinions such as those expressed by Doctor Nahum and Siegel (Evid. Code, § 801)—appellants are confronted by two insuperable problems: first, they failed to preserve their point in the trial court (Evid. Code, § 353); second, they never even attempted to establish that any of the vital opinions expressed by either of the two experts were based "in whole or in significant part" (Evid. Code, § 803) on the out-of-court statements.

The only objection made and ruled on came almost near the end of Doctor Nahum's testimony, long after he had testified that he had read the statements and expressed his opinions. Almost out of the blue appel-

---

[6]As noted one of the opinions given by Siegel was that there had been such a collision. It would, of course, have been ludicrous to ask him to assume the truth of a head-to-head collision in reaching an opinion whether there was one. As we shall see, one of appellants' problems on this appeal is the dearth of appropriate objections. Had they insisted then—as they do now—that Siegel be examined through hypothetical questions, the problem would soon have surfaced. It could, of course, have been easily solved by leaving the assumption out of the question.

lants' counsel asked to take the witness on voir dire and, after eliciting from him that he had "relied" on the pretrial statements, counsel objected to the witness expressing an opinion with reference to the point of impact or the identification of two objects impacting or colliding with one another, on the ground that this portion of his testimony was based upon summaries of eyewitnesses' statements, or eyewitness reports. While counsel elaborated on his objection, he never did move to strike the testimony that was already in the record. Counsel for McHal pointed out that the pretrial statements had been confirmed by the testimony of five eyewitnesses. The objection was overruled.

After Doctor Nahum had been excused and long before Siegel testified, appellants' counsel moved for "a standing objection to the testimony of witnesses in reliance on eyewitness statements . . . ." The motion was not granted as, indeed, it should not have been since no witness was on the stand and the court had no idea just what statements future witnesses might rely on in expressing opinions unrevealed at that point. Having not been granted his standing objection, appellants' counsel should have made specific objections whenever they were called for. Yet not a single objection was made during Siegel's entire testimony.

As far as the only objection that was made is concerned—the one near the end of Doctor Nahum's direct examination—it obviously came much too late and was not even accompanied by a motion to strike. Had it been made at the outset, it would have been a simple matter to correct the cosmetic defect in the presentation of Doctor Nahum's evidence and to ask him to assume, hypothetically, the truth of the testimony of the five eyewitnesses.[7] Even as it was, matters finally got back on track during Doctor Nahum's redirect, when counsel did—at last—ask a hypothetical.

Appellants seek to excuse the failure to object to any part of Siegel's testimony by arguing that in view of the court's earlier ruling objections would have been futile. We do not agree. As we have pointed out, the earlier objection came too late and we have no way of telling how the court would have reacted to prompt insistence that respondents toe the traditional line in presenting Siegel's testimony.[8]

---

[7]This case does not call for an opinion on the question whether the Evidence Code permits greater freedom in examining experts without the use of hypothetical questions, as advocated by Wigmore and indorsed in *Estate of Collin* (1957) 150 Cal.App.2d 702, 713-715 [310 P.2d 663].

[8]Ironically appellants point out that Siegel considered statements of purported eyewitnesses who never testified. Certainly there is nothing in the record to suggest that

Appellants' second problem is that the record fails to reveal that any of the opinions of the two experts would have been different had they not seen the pretrial statements. Indeed, although appellants' counsel cross-examined each at length and did elicit an odd statement or two that the experts "relied" on the pretrial statements, he never did ask a question which would have tested the firmness of their views absent such reliance. Evidence Code section 803, quoted below,[9] provides specifically that even if an opinion is based on impermissible matter, the witness may testify to it if there remains a proper basis after excluding the improper matter from consideration.

We have no doubt that neither witness' views would have changed had he been asked to exclude the pretrial statements from consideration. The important data were clearly the medical records and the film. Yet even if either expert had stated that he needed the statements, respondents' counsel could easily have filled the gap with a hypothetical question incorporating the testimony of the five witnesses.

In sum: although the presentation of the expert testimony lacked some traditional polish, if there was error it was utterly harmless.

*Cross-appeal*

McHal appeals from an order taxing costs claimed for expert witness fees incurred by McHal in the preparation and presentation of its defense.

On or about May 13, 1977, about a month before trial, McHal made a statutory offer to compromise plaintiffs' action against it for the sum of $2,500 (Code Civ. Proc., § 998, subd. (b).) Plaintiffs did not accept the offer.[10] Thereafter, when judgment was rendered in favor of defen-

---

the trial court would have prevented counsel from ascertaining to what extent Siegel's conclusions were based on those statements. The overruling of the objection to Doctor Nahum's testimony was, at least in part, based on the fact that he had apparently looked only at pretrial statements of persons who later became trial witnesses.

[9]"The court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion. In such case, the witness may, if there remains a proper basis for his opinion, then state his opinion after excluding from consideration the matter determined to be improper."

[10]Plaintiffs' complaint sought damages in the amount of $10 million, and plaintiffs also rejected Santa Anita's offer in the amount of $1.25 million.

dants, McHal served and filed its verified memorandum of costs seeking a total of $34,155.94. Plaintiffs moved to tax McHal's costs.

The trial court disallowed expert witness fees claimed by McHal amounting to $24,284.24. In making its ruling the court stated, "I don't feel that McHal's offer was a realistic offer in this case and the expert witness fees will be denied." When questioned by Mr. Davis, counsel for McHal, concerning the basis of its ruling, the court reiterated, "I feel, under the circumstances, it was not a good faith offer and I am exercising my discretion and I am going to disallow those costs. That is final."

Code of Civil Procedure section 998, subdivision (c) provides, "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment, the plaintiff shall not recover his costs and shall pay the defendant's costs from the time of the offer. In addition, in any action or proceeding other than an eminent domain action, the court, in its discretion, may require the plaintiff to pay the defendant's costs from the date of filing of the complaint and a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, the preparation or trial of the case by the defendant."

As was said in *Brown* v. *Nolan* (1979) 98 Cal.App.3d 445 at page 449 [159 Cal.Rptr. 469], "The purpose of this section [Code Civ. Proc., § 988] is to encourage the settlement of litigation without trial. [Citation.] Its effect is to punish the plaintiff who fails to accept a reasonable offer from a defendant."

Under the circumstances of this case the trial court had ample reason to find that the offer was not reasonable. Although McHal's liability was tenuous indeed, having in mind the enormous exposure the trial court could find that McHal had no expectation that its offer would be accepted. From this it follows that the sole purpose of the offer was to make McHal eligible for the recovery of large expert witness fees at no real risk.

While the trial court's statement that the offer was not made "in good faith" was, perhaps, unnecessarily strong, the record certainly supports its statement that it was not "realistic." No abuse of discretion is shown.

The judgment in favor of defendants Los Angeles Turf Club, Inc., and McHal Enterprises, Inc., is affirmed.

The order granting plaintiffs' motion to tax costs is affirmed.

All parties shall bear their own costs on appeal.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied December 4, 1980, and the petition of plaintiffs and appellants for a hearing by the Supreme Court was denied January 21, 1981.