[Crim. No. 23104. June 14, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
DEXTER STANLEY, Defendant and Appellant.

**COUNSEL**

John C. Wakefield, under appointment by the Supreme Court, for Defendant and Appellant.

Quin Denvir, State Public Defender, and Lisa Short, Deputy State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Shunji Asari, Juliet H. Swoboda and Jane Began Sagehorn, Deputy Attorneys General, for Plaintiff and Respondent.

Robin B. Johansen, Kathleen J. Purcell, Joseph Remcho and Remcho, Johansen & Purcell as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**KAUS, J.**—Defendant Dexter Stanley appeals from convictions of (1) sodomy (Pen. Code, § 286, subd. (c)), (2) forcible rape (Pen. Code, § 261, subd. (2)), and (3) oral copulation (Pen. Code, § 288a) and findings that he personally used a deadly weapon—a knife—in the commission of the offenses (Pen. Code, §§ 12022, subd. (b), 12022.3). As in *People* v. *Bledsoe* (1984) *ante,* page 236 [203 Cal.Rptr. 450, 681 P.2d 302] the principal issue raised on appeal is the propriety of the trial court's admission of expert testimony on "rape trauma syndrome." As we explain, however, in this case—unlike *Bledsoe*—defendant's objection at trial was not sufficient to permit him to raise his present claim of error on appeal. In any event, we conclude that in light of the strength of the prosecution's case, any error in

admitting the testimony on rape trauma syndrome was harmless. Accordingly, we affirm.

## I

The prosecution's case revealed the following facts. At the time of the incident, Terri, the victim, had known defendant Stanley for a month and a half. When they first met, defendant had introduced himself as "Stan" and Terri knew him by that name. Although defendant had been to her apartment on several occasions, they had never dated and had never had sexual relations. Sometime before the night of the incident, defendant had asked Terri to keep some PCP for him in her apartment; he knew she was out of work and needed money and he promised to pay her $5 for each PCP-dipped cigarette—"Sherman"—that he sold. Terri agreed to the arrangement but later regretted having the PCP in her apartment and, on the night in question, defendant called Terri to tell her that he was coming by to pick up "his stuff."

About 1 a.m. Terri telephoned a friend, Deborah Washington. After they had spoken for about 30 minutes, the conversation was interrupted by a loud knock on Terri's apartment door. Terri answered the door, returned to the phone, and when Deborah asked who it was, Terri replied "Stan." Terri told Deborah that she would call her back and hung up.

When he entered the apartment, defendant was perspiring heavily, appeared to be intoxicated or high on drugs and was very angry. He immediately began berating Terri, accusing her of "lying" and "playing games"; she did not know what he was talking about. After a few minutes, he grabbed her by the hair. The phone rang. The caller was William Youngblood, a friend Terri had known for more than a year. At defendant's direction, Terri told Youngblood that she would call him back in 10 minutes and hung up.

Defendant then pulled out a knife, held it against Terri's throat and moved it slowly down her entire body, stating "I ought to kill you." He then ordered her to remove her clothes and go to the bed. Terrified, she did as she was told. Still holding the knife, defendant forced Terri to orally copulate him and, after removing his clothes, committed an act of sodomy and an act of sexual intercourse; to Terri's knowledge, he did not ejaculate during any of the sexual assaults. Throughout the attack he threatened to kill her if she told the police, her friends, or anyone else about the incident.

Sometime thereafter, defendant fell asleep. Terri eased off the bed, grabbed her robe and defendant's knife which had fallen on the floor, and

ran to a nearby police station where she reported the sexual attack. The police returned with Terri to the apartment, found defendant naked and asleep in her bed and arrested him. These proceedings followed.

At trial Terri testified to the bulk of the facts just related. Although she and defendant were the only witnesses to the attack, Deborah Washington and William Youngblood corroborated her testimony with respect to the two phone calls. Youngblood also testified that during the call, Terri was "hysterical, crying," and that she was speaking unusually slowly, as if she were being told what to say.

The police officers to whom Terri reported the offense also gave testimony which strongly supported Terri's account. Officer Sylvia Chapman, who was on desk duty when Terri entered the police station about 5 a.m., testified that when Terri arrived she was dressed only in a lounging-type robe, had no shoes on, was holding a knife, and was "hysterical" and "trembling, crying, [and] appeared to be in a state of shock." When Chapman ordered Terri to drop the knife she did not respond; Chapman testified that "[s]he was not comprehending what I was saying at that time. She was just shaking." Chapman also stated that although there were also two male police officers on duty with her, she had to conduct the interview with Terri by herself because every time Terri looked at a male officer she would begin to cry. Finally, Chapman reported that when Terri returned to her apartment with the police officers to arrest defendant, Terri was extremely frightened of him and hid in the back seat of the police car so that he would not see her.

The doctor who examined Terri at the hospital shortly after defendant had been arrested also testified for the prosecution. She stated that during the examination Terri was "[f]earful, but cooperative and sobbing at times." The examination revealed rectal abrasions, which in the doctor's opinion indicated that Terri had had rectal intercourse without a lubricant.[1]

As its final witness in its case-in-chief, the prosecution called Star Vega, a licensed psychological assistant, who had had some experience in rape counseling and who had seen Terri on a weekly basis over a six-month period beginning about six weeks after the incident. Defense counsel objected to Vega's testimony on two grounds: first, she claimed that the prosecution had not provided adequate notice that Vega was to be called as a witness; second, she challenged her qualifications to testify as an expert. In

---

[1]The doctor also prepared slides from swabs of Terri's vaginal, rectal and mouth areas; later laboratory tests of the slides did not detect any spermatozoa. Those results were, of course, consistent with Terri's testimony.

response, the prosecution explained that it had only learned in mid-trial that Terri had been undergoing rape counseling and that it had notified the court and defense counsel as soon as possible; the court accepted the explanation and concluded that the witness should not be barred because of the timing of the notice.[2] With respect to the second objection, the court held a hearing pursuant to Evidence Code section 402, subdivision (b)[3] to consider the witness' qualification to testify as an expert.

At that hearing the witness disclosed that she was a graduate student six months away from receiving her doctorate in psychology, that she had almost six years' experience in clinical work, that she had read numerous books and articles and had completed a number of courses relating to rape counseling, and, finally, that she had personally counseled between 10 and 20 rape victims. In the course of her testimony at the hearing, she also briefly described rape trauma syndrome, indicating that it consisted of two phases—"the acute immediate" and "the long term"; she gave a thumbnail sketch of each phase.

At the conclusion of the hearing, defense counsel renewed her opposition to the admission of the testimony, but based her objection solely on the ground that the witness was not "qualified to testify in this area of rape shock whether it is syndrome or called any other name." Defense counsel argued that the witness' "area of knowledge is too general," that "she is

---

[2]Although the trial court rejected the claim that Vega should be precluded from testifying because she was a "surprise witness," the court did indicate that it was prepared to authorize the employment of a "counter-expert" at public expense, if defense counsel could find an expert "who is prepared to say that they have studied so many rape victims and in their opinion there is no such thing as a rape trauma syndrome." The court made its ruling on Friday, April 3, and gave defense counsel until the following Monday to attempt to find such an expert.

On Monday, defense counsel informed the court that she had spoken with a psychiatrist, Dr. Alvin Davis, but that he had told her that he could not testify unless he was allowed to interview the complaining witness. Counsel asked the court to grant a continuance and to order Terri to submit to an interview by Dr. Davis. The court denied both requests, stating "the only purpose . . . that Dr. Davis would be examining the complaining witness for at this point would be to make an evaluation of her credibility. And I'm not going to permit that kind of examination."

On appeal, defendant maintains that the court erred in denying the requested continuance, arguing that his trial counsel did not have adequate time to research, and to prepare to defend against, the rape trauma syndrome testimony. We need not decide whether the trial court erred in this regard because—as we explain below—we have concluded that, in light of the strength of the prosecution's case, any error which the court may have made with respect to the rape trauma syndrome issue would not have affected the verdict.

[3]Section 402, subdivision (b) provides: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."

nowhere near receiving a license" and that "she has only spoken with probably somewhere about 20 rape victims." The trial court overruled the objection, concluding that the witness "has shown sufficient special knowledge, experience, training and education to qualify as an expert."

In testifying before the jury, Vega first reviewed her professional credentials and experience and briefly described rape trauma syndrome.[4] She then testified that Terri had first been referred to the Bloch Medical Clinic, where Vega worked, several months before the incident in question here, in connection with psychological problems that Terri was experiencing as a result of a work-related injury to her back. Vega stated that she had not interviewed Terri at that time, but first saw her when Terri returned to the clinic on July 23, 1980—six weeks after the attack. Although Terri was referred to Vega as a worker's compensation case, in their first session Terri informed her of the sexual assault and thereafter Vega saw Terri in a counseling capacity on a weekly basis through mid-December 1980; between December 1980 and the trial in April 1981, Vega had seen Terri less frequently.

When asked whether she had found certain symptoms in Terri that she felt were part of the rape trauma syndrome, Vega replied: "She had most of the symptoms reported as part of the trauma syndrome. She was depressed. She had weight loss, lack of appetite. She also had nightmares, extreme anxiety, phobic reaction through sexual insinuations. Not just sexual intercourse as far as I know." In elaborating on Terri's phobic reaction, Vega recounted an incident in August 1980 in which Terri became very upset when a man whom she had met in a casual social setting "became infatuated with her and made some kind of light reference to wanting to see her again and perhaps begin a relationship." Terri became extremely depressed, came to see Vega and "fell apart" in her office, clinging to her and pleading with her not to leave the room. Terri was eventually hospitalized for two days as a result of her depression. When Vega was asked whether she had an opinion as to what caused that depression, she stated that she believed that "it was her reaction to the rape that she had" and that it was part of the rape trauma syndrome.

After detailing some of the additional symptoms Terri had recounted in their interviews—for example her fear that her assailant or his friends would

---

[4]She described rape trauma syndrome as follows: "It is acute stress reaction to the threat of being killed. And it has two phases: [¶] The acute phase includes reaction of anxiety, fear and physical reaction such as insomnia, sleep disturbances and things like that. [¶] And also the emotional reactions which include guilt and shame, depression, and various other systems like that. [¶] The other phase includes changes in the routine of the person which means they may move out of fear that they will be attacked again. And they also report nightmares and dreams related to the rape case, the rape attack itself. [¶] And also develop phobic reactions to the incident itself over a long period of time."

return and kill her—Vega was asked once again whether, in her opinion, Terri "is suffering from and was suffering from rape trauma syndrome." Vega replied, "[Y]es." When asked whether she felt that Terri's worker's compensation problem "had any connection with this," Vega stated: "[I]n our opinion we have attributed 40 percent of her disability to the industrial accident. And it is my opinion and Dr. Bloch's opinion that made her slightly more vulnerable to the effects of the rape. [¶] Had she not had that accident, it is felt that she wouldn't have overcompensated to the point that she did." When the prosecutor inquired whether she was referring to the hospitalization, Vega said: "The hospitalization. There's just the one hospitalization that we know of. [¶] In discussing this case with Dr. Bloch, we came to the conclusion that 60 percent of her psychiatric disability is based upon the reaction to the rape."

On cross-examination, defense counsel asked Vega whether the symptoms which she attributed to rape trauma syndrome could be the same as symptoms which result from a back injury. She replied: "The depression is included in this pain. Depression is part of it, yes." Asked whether anxiety could also be a symptom of the back injury, she answered: "It could be. They are not mutually exclusive. But I did notice that the intensity of [Terri's] level of anxiety and depression was beyond what I had seen in people who had just had industrial injuries." Finally, when asked whether she had based her opinion on what Terri had told her or whether she had independently investigated the situation, Vega indicated that she had not spoken to the examining doctor, read the police reports or done any independent investigation but that she had reviewed the medical reports of the examining doctor that were available to her. After Vega completed her testimony, the prosecution rested.

The defense called a number of witnesses who portrayed Terri's relationship with defendant in a significantly different light than Terri had described. A number of persons, who had worked with defendant at a local record store where Terri and defendant first met, testified that Terri had known defendant for many months before the incident and that during that time Terri had "hung around" the store a great deal, dropping in to speak with defendant three or four times a week. A number of defendant's friends also testified that on several occasions they had dropped off defendant at Terri's apartment late at night—between 9 p.m. and midnight—after defendant finished work.

Defendant testified in his own behalf. He stated that he had met Terri in January 1980, five months before the incident, and that they had dated and had voluntarily had sexual intercourse many times before the alleged rape. He said that several weeks before the June 8 incident, he told Terri that he

was getting back together with his wife from whom he had been separated and that he did not want to see Terri again.

With respect to the night of the incident, defendant testified that after having a few drinks with a friend he stopped by Terri's apartment to tell her to stop phoning his home, to ask her to repay a debt, and to tell her again that he did not want to see her any more. Shortly after he arrived, Terri became very angry and started shouting at him in a very loud voice. When she continued to shout and scream, he slapped her face and she ran into the bathroom. When she refused to come out as he requested, he sat down on her bed to wait for her and fell asleep. The next thing he knew he was awakened by several police officers. He stated that he did not know how all of his clothes had been removed and that he and Terri had not engaged in any sexual activity that night.

As its final witnesses, the defense called two women, defendant's wife and one of his friends at work. They both testified that on the day following the incident they went to Terri's apartment to talk to her and that, at that time, Terri stated: "If I can't have him, I'm going to make sure that no one else will." Terri denied making the statement.

After a little more than a day of deliberation, the jury returned its verdict, finding defendant guilty of sodomy, forcible rape, and oral copulation, and also finding that he had personally used a deadly weapon—a knife—in the commission of the offenses. The court imposed a six-year prison sentence on the sodomy count and imposed five-year terms on both the forcible rape and oral copulation counts, each of those sentences to run concurrently with the sodomy term. In addition, the court imposed a three-year term for the deadly weapon enhancement and a five-year term for a prior rape conviction which defendant had admitted out of the presence of the jury before trial. Each of the enhancements was ordered to run consecutively to the sodomy term and to each other. In sum, defendant was sentenced to serve a total of 14 years in prison.

## II

■ Defendant's principal claim on appeal is that the trial court erred in admitting the expert testimony on rape trauma syndrome because "there is no general acceptance of the theory of 'rape trauma syndrome' in the scientific community"—in other words, because such evidence fails to meet the *Frye* standard of admissibility. (See, e.g., *People* v. *Kelly* (1976) 17 Cal.3d 24, 30-32 [applying test first enunciated in *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 (34 A.L.R. 145)].) As in *Bledsoe* (*supra, ante,* at p. 236), the Attorney General contends that defendant may

not properly raise the issue on appeal because he failed to object to the admission of the evidence on this ground at trial. Here, unlike in *Bledsoe,* the argument is well taken. Although Vega briefly discussed the rape trauma syndrome phenomenon at the Evidence Code section 402 hearing, defense counsel's objection to the admission of her testimony was not directed at either the reliability or the relevance of testimony on the syndrome, but was aimed solely at the sufficiency of Vega's qualifications to testify as an expert. Under these circumstances, defendant may not rely on the *Frye* issue on appeal.[5]

In any event, even if the *Frye* issue were properly before us and assuming—as we held in *Bledsoe*—that the expert testimony on rape trauma syndrome was improperly admitted, we conclude that any error was not prejudicial. Here, as in *Bledsoe,* the prosecution's case was very strong. Terri reported the sexual attack immediately after it occurred, and Officer Chapman's description of Terri's physical and emotional condition at the time of the report provided persuasive corroboration of her account. The medical testimony, while not conclusive, similarly supported Terri's claim that she had been sodomized. Finally, defendant was discovered by the police officers in Terri's bed, and—although he attempted to give an innocent explanation for his presence—his version of the incident had one obvious weakness: it provided no explanation whatsoever for the fact that the police had found him naked. Viewing the record as a whole, we do not believe that the admission of Vega's testimony on rape trauma syndrome affected the verdicts. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[6]

The judgment is affirmed.

---

[5]Alternatively, defendant claims that the trial court abused its discretion in permitting Vega to testify as an expert. In general, of course, a trial court has broad discretion in evaluating the qualifications of an expert (see, e.g., *People* v. *Penny* (1955) 44 Cal.2d 861, 866 [285 P.2d 926]; *People* v. *Maler* (1972) 23 Cal.App.3d 973, 982 [100 Cal.Rptr. 650]), and, although the witness' academic and professional qualifications were not overwhelming, in light of her substantial clinical experience the court's ruling appears well within its discretion. Furthermore, as discussed below, we conclude that any error in admitting Vega's testimony was nonprejudicial.

[6]In addition to his objections to the trial court's rulings with respect to Vega's testimony, defendant contends that the trial court erred (1) in permitting Deborah Washington, William Youngblood and Officer Chapman to testify to certain statements made by Terri, (2) in admitting a written statement signed by defendant, and (3) in modifying the sentence after defendant began to serve his term. Further, defendant asserts that the prosecutor committed prejudicial misconduct in his closing argument and that he was denied adequate representation by trial counsel. The Court of Appeal addressed and rejected all of these claims when the case was before it and, for the reasons stated by that court, we also conclude that the contentions lack merit. (See *People* v. *Ford* (1981) 30 Cal.3d 209, 215-216 [178 Cal.Rptr. 196, 635 P.2d 1176].)

Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Puglia, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.