Filed 7/11/14  P. v. Onsri CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SAENGPHET ONSRI,<br><br>    Defendant and Appellant. | C069110<br><br>(Super. Ct. No. CRF106053)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed in this case on June 20, 2014, be modified as follows:

Page 14, last paragraph, delete the last sentence (beginning with the word Absent) and the citations following that sentence so that the paragraph now reads:

Defendant appears to contend that Officer Duggins opined about defendant's subjective intent. But defendant does not identify any part of the record where such an opinion was rendered.

This modification does not change the judgment.

The petition for rehearing is denied.

FOR THE COURT:


           BLEASE           , Acting P. J.


           HULL           , J.


           MAURO           , J.

Filed 6/20/14  P. v. Onsri CA3 (unmodified version)

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C069110 |
| v. | (Super. Ct. No. CRF106053) |
| SAENGPHET ONSRI, | |
| Defendant and Appellant. | |

A jury convicted defendant Saengphet Onsri of conspiracy to sell methamphetamine, possession of methamphetamine for sale, and gang participation.  The jury found that defendant committed the crimes of conspiracy and possession of methamphetamine for sale for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in any criminal conduct by gang members.  The trial court sentenced defendant to an aggregate term of four years eight months in prison.

1

Defendant now contends (1) substantial evidence does not support the jury's gang enhancement findings; (2) there is insufficient evidence to support his conviction for conspiracy to sell methamphetamine; (3) the trial court prejudicially erred in permitting Officer Labin Wilson to testify that a certain type of plastic baggie was commonly used in narcotics trafficking; (4) the trial court erred in admitting the testimony of Officer Michael Duggins that defendant was working collaboratively with the Asian Gangster Crips gang (AGC) to sell drugs; (5) the trial court erred in instructing the jury that gang participation is a general intent crime; and (6) the trial court violated his constitutional right to confront witnesses when it permitted the prosecution's gang expert to recount hearsay information for the purpose of explaining the basis of his opinion testimony.

We conclude (1) there is adequate factual foundation for the gang expert's testimony about AGC's primary activity of selling narcotics, and there is substantial evidence from which the jury could fairly find beyond a reasonable doubt that AGC engaged in a pattern of criminal gang activity and that defendant committed the current offenses in association with AGC with the specific intent to further or assist in criminal conduct by AGC members; (2) even if we do not consider a recorded conversation between defendant and other cohorts, there is sufficient circumstantial evidence in the record to support defendant's conviction for conspiracy to sell methamphetamine; (3) no prejudice resulted from the admission of Officer Wilson's testimony about plastic baggies commonly used for narcotics trafficking because other witnesses testified, without objection, to the same matter; (4) the trial court did not abuse its discretion in permitting the gang expert to testify about whether defendant's conduct benefitted AGC even though defendant was a member of a different gang; (5) the trial court did not err in instructing the jury on the crime of gang participation, because that crime is not a specific intent crime; and (6) defendant has forfeited his confrontation clause claim because he does not pinpoint any statement which allegedly violated his right of confrontation.

2

BACKGROUND

West Sacramento police conducted surveillance at 481 and 501 Walnut Street because they suspected gang and narcotics activity. 481 and 501 Walnut Street (collectively the property) shared a yard and the property had a long driveway.

481 Walnut Street consisted of three bungalow units occupied by members of the Kalah family, including Dom Kalah and Anthony Kalah.[1] Police believed Dom was an active AGC participant. Dom had the letters "AGC" tattooed on his stomach; he admitted he was an AGC member but said he was no longer in the gang. Police believed Anthony was also an AGC member based on prior contact.

501 Walnut Street consisted of a main house and a detached garage converted into a bedroom. Dom's brother Det and Det's family lived in the main house. Det's son Tommy lived in the detached garage. Tommy admitted he was an AGC member.

Defendant said he was a member of the Tiny Rascal Gangsters (TRG). His MySpace page proclaimed his membership; he also had a tattoo on his arm associated with TRG. Although defendant did not live at the property he spent a fair amount of time there.

Police searched a trash can in front of 501 Walnut Street for indicia of narcotics activity. They found two one-by-one inch plastic baggies that had an 8-ball symbol on them.

As part of their surveillance, officers stopped Jose Ruiz Galvan after he visited the property. Police found about a gram of marijuana on Galvan and cited him for possession of marijuana.

Police stopped David Cole after West Sacramento Police Officer Michael Duggins observed Cole take part in a hand-to-hand drug transaction at the property. Police

---

[1] We will refer to members of the Kalah family by their first names for clarity.

arrested Cole for possession of marijuana and methamphetamine. Cole said he obtained the marijuana from a dark-skinned male at the property.

West Sacramento Police Officer Labin Wilson believed certain individuals observed at the property were AGC members. On one occasion Officer Wilson saw AGC member Pedro Grajeda arrive at 501 Walnut Street and stand in the yard. Officers typically saw a number of people standing on the driveway to the property in a location where the people could see cars parked across the street.

Officer Duggins and West Sacramento Police Officer Anthony Herrera cited Tommy for possession of marijuana for sale about three blocks from the property. Officers found four baggies of marijuana in a pill bottle on Tommy's person. The marijuana was packaged in one-by-one inch plastic baggies, similar to the baggies officers found in the trash can in front of 501 Walnut Street. The baggies found on Tommy also had an 8-ball symbol, like the symbol found on the baggies recovered from the trash can. Tommy was dressed in blue, which was the color associated with AGC. He was accompanied by a self-admitted AGC member.

Six days after the police cited Tommy, Officers Duggins and Wilson, both in full uniforms, parked their car across the street from the property. Officer Wilson saw at least six individuals in the yard, including defendant and Dom. According to Officer Wilson, individuals scurried about the yard after the officers arrived. Defendant came out of one of the units at 481 Walnut Street, looked at the officers, and returned inside the unit. He did that three to four times, and then he walked to another unit at 481 Walnut Street and spoke with Dom, while watching Officer Wilson.

A week later, West Sacramento police officers and other law enforcement officials executed a search warrant at the property. Det and his family were in the main house at 501 Walnut Street. Police found defendant in Det's bedroom. Det told police that prior to the arrival of the officers, defendant ran into Det's house and went into Det's bedroom. Officers found a pill bottle containing seven baggies of methamphetamine in Det's

4

bedroom. The pill bottle was hidden in a clothes hamper. Each baggie contained approximately .1 gram of methamphetamine. The baggies had an 8-ball symbol on them.

Defendant admitted the pill bottle was his and that he hid it in the hamper. He said he obtained his methamphetamine from West Sacramento; he bought "a teener" for almost $100 and sold each little baggie for $5 or $10 each. Defendant denied buying methamphetamine with Tommy; he said he did his own thing.

Officers found Tommy alone in the detached garage. A search of that building led to the discovery of seven plastic baggies, each containing .1 gram of methamphetamine. The plastic baggies had an 8-ball symbol on them. Tommy admitted the methamphetamine belonged to him. He said he bought his methamphetamine from a man in South Sacramento, and he sold each baggy for $10. He denied that he was selling methamphetamine with defendant.

The methamphetamine found at the property weighed close to a 16th of an ounce in total, an amount referred to as a "teener" on the street. Officer Alicia Slater testified, without objection, that a "teener" was a commonly sold amount which was broken up into smaller bags for sale. She said a "teener" sells for about $100 to $120.

Officers also found a glass jar containing .4 grams of Ibuprofen, a digital scale with what appeared to be marijuana residue, an apparent pay-owe sheet, loose ammunition, a magazine for a .25-caliber semiautomatic pistol, and a machete in Tommy's room. Officer Slater opined that the substance in the glass jar was possibly a cutting agent for methamphetamine. There was also AGC-related graffiti and a blue bandana in Tommy's room.

Officers located two empty plastic baggies with a Batman logo under a sofa cushion, a pill bottle with what appeared to be marijuana residue, and AGC-related graffiti in unit C. Dom was the only occupant of unit C at the time of the search.

Police found a sheet of paper with the words "A gang movement, A gang, all gang crucial" written on it and other writings referring to AGC in a binder in unit A. Officers

5

also recovered a large Ziploc baggie containing small baggies and a blue jersey in that unit.

Officers seized a scale and packaging material in a search of defendant's residence. The packaging material found in defendant's home appeared identical to the plastic baggies found at the property. Officers did not find methamphetamine in defendant's home.

Police arrested Det, Dom, Tommy, Anthony, and defendant. Officers detained Pedro Grajeda at the property on the night of the search, but Grajeda was not charged with any crime in this case.

A jury convicted defendant of conspiracy to sell methamphetamine (Pen. Code, § 182, subd. (a)(1) -- count 1),[2] possession of methamphetamine for sale (Health and Safety Code, § 11378 -- count 2), and gang participation (§ 186.22, subd. (a) -- count 4).[3] Regarding counts 1 and 2, the jury found true the allegations that defendant committed the charged offenses for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. The trial court sentenced defendant to an aggregate term of four years eight months in prison.

---

[2] Undesignated statutory references are to the Penal Code.

[3] Count 3 (maintenance of location for unlawful activities) and count 6 (possession of ammunition by a person prohibited from possessing a firearm) were not alleged against defendant. The trial court granted the defense motion for the entry of a judgment of acquittal in favor of Det and as to the count 5 charge of possession of a firearm by a felon, in favor of Anthony, Dom and defendant. The jury could not reach a verdict as to all charges against Anthony and Dom. The trial court declared a mistrial as to them.

DISCUSSION

I

Defendant claims substantial evidence does not support the jury's gang enhancement findings.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) We do not reweigh the evidence or reevaluate witness credibility. (*Id.* at p. 60.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*Ibid.*) We will reverse the judgment for insufficiency of the evidence only if the defendant demonstrates that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 610.)

Specifically, defendant contends substantial evidence does not support the jury's findings on count 1 (conspiracy) and count 2 (possession of methamphetamine for sale) that (A) the commission of one or more of the crimes enumerated in the gang statute was a primary activity of AGC, (B) the members of AGC either separately or collectively have engaged in a pattern of criminal gang activity, and (C) defendant committed the charged offenses for the benefit of, at the direction of, or in association with the criminal street gang, with the specific intent to promote, further or assist in any criminal conduct by gang members. We will address each contention in turn.

7

A

Defendant claims substantial evidence does not support the jury's finding that AGC had as one of its primary activities the commission of one or more of the crimes listed in the gang statute. Defendant says there is inadequate factual foundation for the prosecution gang expert's testimony about the primary criminal activities of AGC because the expert did not state how the referenced conduct related to AGC or where, when, or how he knew about such activities.

Section 186.22, subdivision (b) provides enhanced penalties for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Albillar, supra,* 51 Cal.4th at p. 60.) A "criminal street gang" is "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of [section 186.22] subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

The "primary activities" prong requires proof that a chief, or more than occasional, activity of the group is the commission of at least one of the enumerated crimes in section 186.22, subdivision (e). (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) Past offenses and the circumstances of the current crimes may be considered in determining a group's primary activities. (*Ibid.*) Evidence that members of the group consistently and repeatedly committed the enumerated crimes in section 186.22, subdivision (e) could satisfy the "primary activities" requirement. (*Id.* at p. 324.) Expert opinion testimony like the type presented in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*) could also be used to establish the requirements in section 186.22, subdivision (b). (*Sengpadychith, supra,* 26 Cal.4th at p. 324; *Gardeley, supra*, 14 Cal.4th

8

at pp. 617-620; *People v. Killebrew* (2002) 103 Cal.App.4th 644, 656-657, disapproved on another point in *People v. Vang* (2011) 52 Cal.4th 1038, 1049.)  Gang expert testimony may be based on conversations with gang members, the expert's own investigation of gang-related crimes, and information obtained from other law enforcement officers.  (*Sengpadychith, supra*, 26 Cal.4th at p. 324; *Gardeley, supra*, 14 Cal.4th at p. 620.)

Here, West Sacramento Police Officer Michael Duggins testified as the prosecution's gang expert.  Defendant does not challenge Officer Duggins's qualification to testify as a gang expert.  Officer Duggins received continuous formal training on gangs and had routine contact with gang members in West Sacramento.  He worked closely with law enforcement authorities in Yolo and Sacramento Counties that dealt with gang crimes.  He routinely reviewed "intelligence files" and police reports by West Sacramento police officers and other law enforcement agencies relating to gang crimes.  His opinion about gang psychology was based in part on information he and other officers received from gang members.  Officer Duggins spoke with gang members about what it took to join a gang, advance within a gang, put in work, and leave a gang.  In the year prior to the arrests for the current offenses, Officer Duggins contacted 10 to 15 Asian gang members, excluding the defendants in this case.  He estimated that, excluding the defendants in this case, there were at least 20 Asian gang members living in West Sacramento.  He spoke with AGC members about their rivals, signs, and symbols.

Officer Duggins opined that the primary activities of AGC included narcotics sales.  The sale, possession for sale, or offer for sale of controlled substances is an offense listed in section 186.22, subdivision (e) which can be used to establish the "primary activities" prong.  (§ 186.22, subds. (e)(4), (f).)  In Officer Duggins's experience, AGC members sold methamphetamine.  Unlike the gang experts in *In re Alexander L.* and *In re Nathaniel C*., Officer Duggins provided details about narcotics violations by AGC.  (*In re Alexander L., supra*, 149 Cal.App.4th at pp. 611-612

9

[appellate court could not discern the basis for the gang expert's opinion testimony]; *In re Nathaniel C*. (1991) 228 Cal.App.3d 990, 997-998, 1003-1004 [gang expert provided nonspecific hearsay from another officer and testified about the activities of gangs that were not the defendant's gang].)

Officer Duggins described the December 2008 arrest of validated AGC member Sang Soth for possession of narcotics for sale. Officers seized 28 grams of methamphetamine packaged in sandwich bags, $5,000 in cash, and various weapons from Sang Soth's house. Officer Duggins's testimony about the Sang Soth arrest was based on a Stockton Police Department police report. Gang expert testimony may be based on information obtained from police reports. (*People v. Williams* (2009) 170 Cal.App.4th 587, 622; *In re I.M*. (2005) 125 Cal.App.4th 1195, 1207-1208.)

Officer Duggins also testified extensively about the circumstances leading to the arrest of self-admitted AGC member Tommy Kalah for the current narcotics offenses. Officer Duggins participated in the investigation that led to Tommy's arrest. Police found seven baggies of methamphetamine in Tommy's room. In addition, Officer Duggins cited Tommy for possession of marijuana for sale about two weeks before the search at the property. Officers found four baggies of marijuana on Tommy on that occasion.

There was adequate factual foundation for Officer Duggins to testify about AGC's primary activity of selling narcotics. Substantial evidence supports the jury's finding that AGC had as one of its primary activities the commission of a crime listed in the gang statute.

B

Defendant also claims substantial evidence does not support the jury's finding that members of AGC either separately or collectively have engaged in a pattern of criminal gang activity. Defendant states in a cursory manner that Officer Duggins's opinion

10

testimony does not show any more than the occasional commission of enumerated crimes by AGC.

The phrase "pattern of criminal gang activity" in section 186.22, subdivision (f) means the commission, attempted commission, conspiracy to commit, solicitation, or conviction of two or more acts of criminal conduct specified in section 186.22, subdivision (e), provided that at least one of those offenses occurred after September 26, 1988, the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions or by two or more persons. (*Gardeley, supra*, 14 Cal.4th at pp. 616, 623.) As we have explained, the offenses enumerated in section 186.22, subdivision (e) includes the sale, possession for sale, or offer for sale of controlled substances. (§ 186.22, subd. (e)(4).)

Officer Duggins testified that AGC engaged in a pattern of criminal activity. The officer considered the circumstances of the current offense as part of AGC's pattern. The charged offenses may serve as a predicate offense needed to establish a "pattern of criminal gang activity." (*Gardeley, supra*, 14 Cal.4th at pp. 624-625.)

Additionally, as described *ante*, Officer Duggins testified about the December 2008 arrest of AGC member Sang Soth for possession of narcotics for sale. That crime is a second predicate offense.

The referenced offenses occurred after September 26, 1988. The current offenses occurred within three years after the 2008 arrest of Sang Soth. And the predicate offenses were committed on separate occasions or by two or more persons.

Officer Duggins's testimony supported the jury finding that members of AGC either separately or collectively have engaged in a pattern of criminal gang activity.

C

Defendant further argues substantial evidence does not support the jury's section 186.22, subdivision (b)(1) finding that defendant committed the charged offenses for the

11

benefit of, at the direction of, or in association with the criminal street gang, with the specific intent to promote, further or assist in any criminal conduct by gang members.

According to defendant, there is no evidence that any profit from his narcotics sales was paid to AGC, or that his narcotics sales benefitted the gang or was at the direction of the gang. But section 186.22, subdivision (b)(1) is phrased in the disjunctive; the prosecution need only prove that the defendant committed a felony for the benefit of, at the direction of, *or* in association with any criminal street gang. Here, the prosecution argued defendant committed the charged offenses in association with AGC. (§ 186.22, subd. (b)(1); *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331-1332.) As we will explain, there is substantial evidence in the record from which a trier of fact could fairly find beyond a reasonable doubt that defendant committed the present offenses in association with AGC, a criminal street gang, with the specific intent to further or assist in criminal conduct by AGC members.

Officer Duggins opined that Tommy and Pedro Grajeda were AGC members, and defendant was a member of TRG. Defendant does not dispute the evidence of those gang memberships. Although AGC and TRG were rivals, defendant committed crimes with AGC members. Defendant was arrested for vehicular burglary with AGC member Sem Yom in 2008. Defendant was arrested with AGC member Jaime Phongsavanh on another occasion in 2008. During his December 2010 police interview, defendant said, "You can be from a different set and . . . you still can work together." Officer Duggins explained how defendant's actions benefitted AGC even though defendant was a member of a different gang.

Tommy denied that the methamphetamine he was selling was AGC methamphetamine. But there was evidence connecting the narcotics sales activity at the property to AGC. Police found indicia of narcotics sales and gang materials in Tommy's room. Tommy's MySpace page referenced gangs and advertised narcotics for sale, suggesting to Officer Duggins a connection between his narcotics activity and AGC. The

12

link between narcotics sales and AGC may also be inferred from the evidence concerning Tommy's citation for possession of marijuana for sale two weeks before the search at the property. Tommy wore blue-colored clothing, was in the company of a self-admitted AGC member, and possessed four baggies of marijuana. Officer Duggins opined that wearing the color blue let people know Tommy was a gang member. Tommy admitted he sold methamphetamine at 501 Walnut Street. And he concedes that present or former AGC members lived at the property.

Even though he did not live at the property, defendant spent a fair amount of time there with Tommy. Defendant admitted he owned one of the caches of methamphetamine found at the property. He also admitted he possessed the methamphetamine for sale.

Evidence that gang members actively assisted each other and relied on the apparatus of the gang in committing the charged offenses may establish that they committed the offenses in association with the gang. (*Albillar, supra*, 51 Cal.4th at pp. 60-62.) Tommy and his friends acted as lookouts at the property. Officer Wilson saw AGC members, including Pedro Grajeda, at the property during police surveillance. On one occasion, defendant monitored officers who had parked their car near the property. Officer Duggins explained that being a gang member helps in dealing drugs, because gang members work together to avoid law enforcement scrutiny, to guard against robberies, and to intimidate neighbors, community members and rival gang members. Officer Duggins said gang members commit crimes together because there is strength in numbers, and by working together gang members can intimidate others and gain respect from fellow and rival gang members.

Tommy and defendant claimed they sold methamphetamine independently. However, Officer Herrera said there were dire consequences when a gang member "snitched" on another gang member, providing an explanation for defendant and Tommy's statements. In any event, defendant visited Tommy at the property regularly.

13

The methamphetamine found in Tommy's room had the identical packaging and appearance as the methamphetamine defendant admitted was his. Police found the same packaging material when they searched defendant's home. Additionally, defendant and Tommy had the same number of baggies of methamphetamine on the date of the search, and both said they sold each baggie of methamphetamine for $10. Defendant said he bought "a teener," which was an amount that was commonly bought and then broken up into smaller bags for sale. And Tommy and defendant's methamphetamine weighed close to a "teener."

The jury could fairly deduce from the evidence that there was a connection between the narcotics activity at the property and AGC, and that defendant and Tommy were engaged in narcotics sales together.

If substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members. (*Albillar, supra*, 51 Cal.4th at p. 68.) Tommy and Pedro Grajeda were AGC members. Both had gang tattoos. AGC-related graffiti was displayed on the wall and on a table in Tommy's room. Police also found a blue bandana in that room. The jury could reasonably conclude that defendant knew Tommy and Pedro Grajeda were AGC members, the three worked together as gang members to sell methamphetamine, and defendant intended to further or assist the illegal narcotics sales activities of AGC members.

Defendant appears to contend that Officer Duggins opined about defendant's subjective intent. But defendant does not identify any part of the record where such an opinion was rendered. Absent citation to the record, the contention is forfeited. (*In re S.C.* (2006) 138 Cal.App.4th 396, 406; *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282-283.)

14

Defendant further argues the prosecution must prove that he committed the charged offenses to further some other criminal conduct by AGC. But that argument (and the holdings in the cases cited by defendant) was rejected in *Albillar, supra*, 51 Cal.4th at pages 64 to 66. Accordingly, the argument lacks merit. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

II

Defendant next asserts there is insufficient evidence to support his count 1 conviction for conspiracy to sell methamphetamine. He claims there is no evidence that he was aware of the objective of the alleged conspiracy.

Conspiracy is an agreement to commit any crime. (§ 182, subd. (a)(1); *People v. Johnson* (2013) 57 Cal.4th 250, 262.) The crime of conspiracy has the following elements: (1) an agreement between two or more people, (2) the specific intent to agree or conspire to commit an underlying offense, (3) the specific intent to commit the underlying offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy. (*People v. Swain* (1996) 12 Cal.4th 593, 600; *People v. Vu* (2006) 143 Cal.App.4th 1009, 1024.) A conspiracy may be inferred from the conduct, relationship, and interests of the alleged conspirators before and during the alleged conspiracy. (*People v. Bogan* (2007) 152 Cal.App.4th 1070, 1074.)

It is unnecessary to show that the alleged conspirators met and expressly agreed to commit a crime. (*In re Nathaniel C., supra*, 228 Cal.App.3d at p. 999.) The evidence is sufficient if it supports an inference that the parties tacitly came to a mutual understanding to commit a crime. (*Ibid.*) The overt acts done pursuant to the conspiracy may establish the existence of an agreement and the purpose and intent of the conspiracy. (*Id.* at p. 1000; *People v. Lipinski* (1976) 65 Cal.App.3d 566, 576-577.) A conspirator's conduct after the commission of the overt act may also establish the intent to agree and the specific intent to commit the underlying offense. (*People v. Jurado* (2006) 38 Cal.4th

15

72, 121.)  Regarding the element of an overt act, the commission of the offense that is the object of the conspiracy is not required.  (*People v. Johnson, supra,* 57 Cal.4th at p. 258; *People v. Swain, supra,* 12 Cal.4th at p. 599.)  The overt act need not even amount to a criminal act.  (*People v. Johnson, supra,* 57 Cal.4th at p. 259.)  Moreover, any one of the conspirators, and not necessarily the defendant, may commit the overt act to consummate the conspiracy.  (*People v. Russo* (2001) 25 Cal.4th 1124, 1135.)

Defendant claims his recorded, postarrest conversation with Dom and Anthony does not evidence the existence of a conspiracy to sell methamphetamine, and those out-of-court statements were inadmissible because at the time of the conversation, the object of the alleged conspiracy had been defeated by the arrest of the alleged conspirators.  However, even if we do not consider the recorded conversation between Dom, Anthony and defendant, there is sufficient circumstantial evidence in the record to support defendant's conviction for conspiracy to sell methamphetamine.

Defendant frequented the property where Tommy lived.  (*People v. Duran* (2001) 94 Cal.App.4th 923, 931 [evidence that the defendant spent much of an evening on the premises where a methamphetamine laboratory was located connected the defendant to the conspiracy to manufacture methamphetamine].)  One witness said defendant was at the property every other week.  Defendant hung out with Tommy.  On one occasion, defendant watched police officers from the property.  While mere association with the perpetrators of a crime does not establish participation in a conspiracy, it provides a starting point.  (*In re Nathaniel C., supra*, 228 Cal.App.3d at p. 999.)

Police found indicia of narcotics activity, including a scale and an apparent pay-owe sheet, in Tommy's room.  Tommy's cousin said that almost every time he entered Tommy's room he saw small Ziploc-type baggies on the floor.  Tommy advertised that he had marijuana and methamphetamine for sale.  Police observed short-stay traffic and the use of lookouts at the property.  Police confirmed the sale of methamphetamine to

16

someone who had visited the property. And Tommy was previously cited for possession of marijuana for sale.

When officers entered the property to execute a search warrant, defendant ran and hid his methamphetamine. (*People v. Duran*, *supra*, 94 Cal.App.4th at p. 931 [fleeing the premises was relevant to the conspiracy charge].) In defendant's home, officers found a scale and packaging material that looked like the packaging material found at the property. Defendant admitted he possessed methamphetamine for sale.

The methamphetamine seized from defendant and Tommy was similarly packaged in small Ziploc baggies with an 8-ball symbol, and each baggie contained the same amount of methamphetamine. In addition, Tommy and defendant's methamphetamine approximately totaled the amount of a "teener," which was the amount defendant said he had purchased.

Officer Herrera explained why gang members will not "snitch[]" on another gang member, giving a reason for Tommy's denial that he sold methamphetamine with defendant. Officer Duggins explained why gang members work together to commit crimes and that defendant committed crimes with AGC members.

Even if defendant is correct that the holding of *United States v. Krasovich* (9th Cir. 1987) 819 F.2d 253 requires a showing that he was aware of the objective of the alleged conspiracy to be guilty of conspiracy under California law, the jury could reasonably infer from all of the above evidence that defendant knew Tommy sold narcotics and defendant conspired with Tommy to sell methamphetamine, with knowledge of the objective of the conspiracy.

Defendant argues there is no evidence that he had any reason to believe his narcotics sales were dependent on a larger conspiracy. He asserts such proof is required, citing *United States v. Martin* (9th Cir. 1993) 4 F.3d 757, a case involving violations of federal statutes dealing with conspiracy and possession of controlled substances with intent to distribute. Defendant raised this contention for the first time in his reply brief

17

and does not show good cause for the failure to present it earlier. The claim is forfeited. (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.)

### III

Defendant further claims the trial court prejudicially erred in permitting Officer Wilson to testify that plastic baggies, like those recovered from the garbage can in front of 501 Walnut Street, were commonly used in narcotics trafficking.

We review the alleged error for abuse of discretion. (*People v. Bolin* (1998) 18 Cal.4th 297, 321-322; *People v. Stanley* (1984) 36 Cal.3d 253, 261, fn. 5.) We will reverse the defendant's conviction only if it is reasonably probable the defendant would have received a more favorable result in the absence of the error. (*People v. Stanley, supra,* 36 Cal.3d at p. 261 [applying *People v. Watson* (1956) 46 Cal.2d 818 standard].)

Officer Wilson, a seven-year veteran with the West Sacramento Police Department, found three plastic baggies in the trash can in front of 501 Walnut Street. He described two of the baggies as one-by-one inch in size and having an 8-ball symbol on them. He said "these little Ziploc baggies are common for narcotics trafficking. It's what they package the narcotics in for small --" Before Officer Wilson could complete his sentence, Anthony's trial counsel objected that the testimony lacked "foundation for expertise." The trial court overruled the objection. Thereafter, Officer Wilson finished his sentence, adding, "For drug transactions." Officer Wilson said he found an off-white, crystal-like residue which he believed was methamphetamine in the two small baggies. He then testified about whether different tests were used for different suspected controlled substances. He began to say that methamphetamine could be confused for another substance when Anthony's trial counsel again objected, asserting lack of foundation for expert testimony. The prosecutor then elicited testimony concerning Officer Wilson's training and experience with regard to controlled substances. Officer Wilson said he had formal training in the area of recognizing controlled substances,

specifically methamphetamine, and that he had encountered methamphetamine in the field over 200 times.

Defendant contends there was no foundation for Officer Wilson's expert opinion that small plastic baggies like those found in the trash can were commonly used in narcotics sales. Although defendant did not object to Officer Wilson's testimony at trial, he claims his contention is not forfeited because his codefendant objected to the testimony, and it would have been futile for defendant to raise the same objection once the trial court overruled his codefendant's objection.

But even if defendant did not forfeit his contention, and even if the trial court erred, no prejudice resulted. Any error in admitting Officer Wilson's testimony would not require reversal of defendant's convictions because other witnesses testified, without objection, to the same matter. Their testimony on the issue was uncontroverted. Narcotics sales expert Deputy Gary Hallenbeck told the jury that plastic baggies with an 8-ball symbol were very commonly used as packaging in narcotics trafficking operations. Department of Justice senior criminalist Boyd Lasater said, without objection, that he had seen similar baggies used many times as packaging for substances submitted for controlled substance testing. Officer Duggins similarly testified, without objection, that the plastic baggies used for packaging the methamphetamine (which Tommy and defendant admitted belonged to them) were not unusual. Officer Duggins had seen packaging like that routinely. Under the circumstances, there is no reasonable probability that defendant would have received a more favorable result in the absence of the challenged testimony by Officer Wilson. (*People v. Prieto* (2003) 30 Cal.4th 226, 247 [applying the standard of *People v. Watson*, *supra*, 46 Cal.2d 818, to the erroneous admission of expert testimony].)

IV

Defendant next argues the trial court erred in admitting the testimony of Officer Duggins that defendant was working collaboratively with AGC to sell drugs.

19

Expert opinion testimony is admissible if the subject matter of the testimony is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a); *Gardeley, supra*, 14 Cal.4th at p. 617.) Such testimony is admissible even if it concerns an ultimate issue in the case. (Evid. Code, § 805; *People v. Vang, supra,* 52 Cal.4th at p. 1048.) The culture and habits of criminal street gangs, the gang motive for a crime, and whether a crime was committed to benefit the gang are proper subject matters of expert opinion because they are sufficiently beyond common experience that expert opinion would be of help to the trier of fact. (Evid. Code, § 805; *People v. Vang, supra,* 52 Cal.4th at p. 1048; *Gardeley, supra*, 14 Cal.4th at p. 617; *People v. Killebrew, supra,* 103 Cal.App.4th at pp. 656-657; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.) On the other hand, expert opinion testimony is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the expert. (*People v. Torres* (1995) 33 Cal.App.4th 37, 45; see also *People v. Vang, supra*, 52 Cal.4th at p. 1048.)

" 'As a general rule, a trial court has wide discretion to admit or exclude expert testimony. [Citations.] An appellate court may not interfere with the exercise of that discretion unless it is clearly abused. [Citation.]' " (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.)

Defendant contends that by saying defendant was working collaboratively with AGC, Officer Duggins expressed an opinion about whether defendant committed conspiracy, and it was improper for Officer Duggins to express such an opinion. A witness may not express an opinion about the defendant's guilt or innocence because such opinion is of no assistance to the trier of fact. (*People v. Torres, supra,* 33 Cal.App.4th at p. 47.)

Read in context, however, the challenged expert testimony did not relate to the ultimate question of guilt or innocence, but instead pertained to whether defendant's conduct benefitted AGC even though defendant was a member of a different gang.

20

Expert opinion on such a subject is admissible.  (*People v. Valdez*, *supra*, 58 Cal.App.4th at pp. 507-509.)  None of the defendants objected on the ground that the statement by Officer Duggins pertained to conspiracy.[4]

The challenged testimony by Officer Duggins was part of a line of questioning by the prosecutor that dealt with whether the collective sale of narcotics benefits a gang.  Officer Duggins said none of the defendants were employed, yet the Kalahs paid rent for the property and Tommy and defendant were able to purchase drugs.  Officer Duggins then said he believed defendant was working collaboratively with AGC to sell drugs even though defendant was not an AGC member.  Officer Duggins opined that if a person was helping gang members sell drugs and money was "going back to continue to finance that enterprise," the person was benefitting the gang, irrespective of whether he was a member of that gang or a different gang.

Similar opinion testimony was determined to be admissible in *People v. Valdez*, *supra*, 58 Cal.App.4th 494.  In that case, the gang expert explained that historically Norteño gangs fought with each other but sometimes members of different Norteño gangs banded together to fight a common enemy.  (*Id.* at p. 502.)  The expert opined that a group consisting of members of seven different Norteño gangs united for the purpose of fighting rival Sureño gang members when they committed the charged offenses, which included conspiracy and gang enhancements.  (*Id.* at pp. 498, 503-504.)  The expert said the Norteño group acted for the benefit of, in association with, or at the direction of all seven Norteño gangs.  (*Id.* at p. 504.)  He explained how and why each member of the Norteño group acted for the benefit of each other's gangs.  (*Ibid.*)  The appellate court held that because the members of the Norteño group were diverse, expert opinion helped

---

[4]  The parties were aware that the prosecution's gang expert could not testify about the existence of a conspiracy because the trial court denied the People's in limine motion to allow its expert to testify about whether certain conduct constituted a conspiracy.

the jury understand how and why such a group could have been acting for the benefit of a criminal street gang and whether the participants were doing so.  (*Id.* at pp. 508-509.)

Here, the challenged testimony by Officer Duggins explained why and how a TRG member could have been acting for the benefit of AGC in selling narcotics.  Defense gang expert James Hernandez also provided an opinion about whether one gang benefitted another gang in this case and whether the narcotics sales at the property were for the benefit of, at the direction, or in association with a criminal street gang.  The subject of the challenged testimony was sufficiently beyond the common experience of the jury to justify expert opinion testimony.  (*People v. Valdez*, *supra*, 58 Cal.App.4th at pp. 508-509.)

Defendant adds that the challenged testimony was impermissible because it concerned defendant's mental state.  Although it is true that an expert cannot testify regarding a defendant's intent (*In re Frank S*. (2006) 141 Cal.App.4th 1192, 1197), Officer Duggins did not testify about what defendant was thinking or what he intended.

The trial court did not abuse its discretion in admitting the challenged testimony.

In any event, as we have explained ante, other evidence established that defendant committed crimes with AGC members.  And substantial evidence supports defendant's conviction for conspiracy to sell methamphetamine and the gang enhancement findings.  Further, as the trial court instructed, the jury was not bound by Officer Duggins's opinion and could disregard any expert opinion it found unbelievable, unreasonable or unsupported by evidence.  (§ 1127b.)  Defendant has not demonstrated a reasonable probability that he would have obtained a more favorable result without the challenged testimony.

V

Defendant further contends the trial court erred in instructing the jury that gang participation (§ 186.22, subd. (a) -- count 4) is a general intent crime.  He claims the

crime of gang participation requires the specific intent to promote, further or assist the gang in felonious criminal conduct.

The Attorney General argues that defendant forfeited his appellate claim by not objecting at trial. We will review the merits of defendant's instructional error claim because he contends the trial court's instructions violated his right to trial by jury. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

A

We begin by concluding that the crime of gang participation (§ 186.22, subd. (a)) is a general intent crime because the statute does not contain specific intent language. (*People v. Hood* (1969) 1 Cal.3d 444, 456-457 [in general, a crime is a general intent crime when the definition of the crime consists of a description of a particular act, without reference to intent to do a further act or achieve a future consequence and the issue is whether the defendant intended to do the proscribed act]; *People v. Thurston* (1999) 71 Cal.App.4th 1050, 1053 [regarding statute penalizing willful infliction of corporal injury, use of the word "willfully" without any additional specific intent language denotes a general intent crime]; *People v. Johnson* (1998) 67 Cal.App.4th 67, 72 [willful failure to register as a sex offender].)

The crime of gang participation has three elements: (1) active participation in a criminal street gang, i.e., participation that is more than nominal or passive; (2) knowledge that the members of the gang engage in or have engaged in a pattern of criminal gang activity; and (3) conduct that willfully promotes, furthers, or assists in any felonious criminal conduct by members of the gang. (§ 186.22, subd. (a); *People v. Lamas* (2007) 42 Cal.4th 516, 523.) Unlike section 186.22, subdivision (b), which states that imposition of the gang enhancement requires proof of "specific intent to promote, further, or assist in any criminal conduct by gang members," section 186.22, subdivision (a) does not refer to any particular intent. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1134-1135 [section 186.22, subdivision (a) does not require a specific

23

intent to further or promote the gang, only knowledge of the gang's pattern of criminal activity]; *People v. Rios* (2013) 222 Cal.App.4th 542, 561 [section 186.22, subdivision (a) does not contain a specific intent requirement].) The Legislature could have expressly denoted a specific intent requirement in section 186.22, subdivision (a), but it did not include such language. (*Albillar, supra*, 51 Cal.4th at p. 56 [when different words are used in contemporaneously enacted and adjoining subdivisions of a statute, the inference is compelling that a difference in meaning was intended].) The word "willfully" describes a willingness to commit the act, and does not impose a specific intent. (§ 7, subd. 1.)

The cases defendant cites are inapposite. Unlike section 186.22, subdivision (a), the statutes in *People v. Dollar* (1991) 228 Cal.App.3d 1335 (*Dollar*) and *People v. Wesley* (1988) 198 Cal.App.3d 519 (*Wesley*) contain language expressly requiring a particular intent. (*Dollar, supra*, 228 Cal.App.3d at p. 1341; *Wesley, supra,* 198 Cal.App.3d at pp. 523-524.) The statute in *Dollar* proscribed threats to use force or violence, made with the intent to carry out the threat so as to cause the victim fear. (*Dollar, supra*, 228 Cal.App.3d at pp. 1341-1342.) *Wesley, supra,* 198 Cal.App.3d at pages 522 to 523, involved a statute penalizing willful failure to appear for the purpose of evading the process of the court. The hate crime statutes in *In re M.S.* (1995) 10 Cal.4th 698, 712-713 were modeled after a federal statute which, unlike section 186.22, subdivision (a), had long been interpreted to require a specific intent. *People v. Castenada* (2000) 23 Cal.4th 743 did not discuss whether a violation of section 186.22, subdivision (a) is a specific, as opposed to a general, intent crime.

Defendant's reliance on *People v. Herrera* (1999) 70 Cal.App.4th 1456, disapproved in *People v. Mesa* (2012) 54 Cal.4th 191, 199, is also misplaced. *People v. Herrera* did not examine whether gang participation is a specific intent crime. (*People v. Herrera, supra,* 70 Cal.App.4th at pp. 1465-1468.)

24

Turning to defendant's challenge to the jury instructions, we determine the correctness of the instructions by examining the entire charge of the trial court and not from a consideration of parts of the instruction or from a particular instruction. (*People v. Harrison* (2005) 35 Cal.4th 208, 252.)  The totality of the instructions given in this case correctly instructed the jury on the elements of the crime of gang participation.

The trial court instructed the jury, pursuant to CALCRIM No. 252, that the charged crimes required proof of the union or joint operation of act and wrongful intent. The trial court identified the count 4 charge of gang participation as a general intent crime.  It said that for a general intent crime, the jury must find the defendant intentionally committed the prohibited act.  The trial court then instructed the jury that in order to find a defendant guilty of the crime of gang participation, the People must prove that (1) the defendant actively participated in a criminal street gang, (2) when the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity, and (3) the defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by (a) directly and actively committing a felony offense or (b) aiding and abetting a felony offense.  The trial court defined the term "willful act" as an act done willingly or on purpose.

The instructions correctly identified the elements of gang participation.  (§ 186.22, subd. (a); *People v. Lamas, supra,* 42 Cal.4th at p. 523.)  There is no reasonable likelihood the jury could have been confused regarding the requisite elements for the crime.  Defendant's claim of instructional error lacks merit.

VI

Defendant also argues the trial court violated his Sixth Amendment right to confront witnesses when it permitted the prosecution's gang expert to recount hearsay information for the purpose of explaining the basis of his opinion testimony.  Defendant

acknowledges that some appellate courts have held that gang experts may relate the hearsay information upon which they relied in forming their expert opinion without violating the confrontation clause. But he urges us to adopt the contrary opinion of five justices in *Williams v. Illinois* (2012) ___ U.S. ___ [183 L.Ed.2d 89] (*Williams*).

But *Williams, supra,* __U.S. __ [183 L.Ed.2d 89], and also *People v. Cooper* (2007) 148 Cal.App.4th 731, at pages 743-745, show that the determination of whether a statement is subject to the confrontation clause requires a fact-specific analysis of the statement at issue. Here, we cannot determine whether any statement by Officer Herrera or Officer Duggins is hearsay and testimonial, thereby implicating the confrontation clause, because defendant does not pinpoint, in the 454 pages of the reporter's transcript referenced in his opening brief, any particular statement by the officers which allegedly violated the confrontation clause. (*People v. Loy* (2011) 52 Cal.4th 46, 66 [only the admission of testimonial hearsay statements violates the confrontation clause].) Defendant bears the burden to affirmatively demonstrate error. (*People v. Britton* (1936) 6 Cal.2d 10, 13; *People v. Battle* (2011) 198 Cal.App.4th 50, 62.) His failure to support his claim of error with pertinent analysis forfeits the claim. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1107, fn. 37 [we may reject an appellate contention that is raised in a perfunctorily manner, without any analysis or argument in support]; *People v. Galambos*

(2002) 104 Cal.App.4th 1147, 1159 [claim that is not developed by citations and analysis is forfeited].)

## DISPOSITION

The judgment is affirmed.

                                      MAURO              , J.

I concur:

          HULL            , J.

I concur with the opinion except as to part V, as to which I concur in the result:

          BLEASE         , Acting P. J.